UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| **LEO TRIPP, ET AL.** | **CIVIL ACTION NO. 17-0542** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **RICHARD PICKENS, ET AL.** | **MAG. JUDGE MARK L. HORNSBY** |

## RULING

This is a contract dispute between the parties. Plaintiffs Leo Tripp, his father, Jimmy Tripp, and their business associate, Steve Stone, brought this action against Defendants Richard Pickens ("Pickens") and Richart Distributors d/b/a Flomore Products ("Flomore"), alleging that they failed to honor a contract to split the profits on a solar-powered oil field pump. Plaintiffs assert claims of breach of contract, detrimental reliance, and unjust enrichment and seek damages, including punitive damages. Pending before the Court is a Motion for Summary Judgment [Doc. No. 29] filed by Defendants.

For the following reasons, the Motion for Summary Judgment is DENIED.

## I. FACTS AND PROCEDURAL HISTORY

While not conceding the truth of the facts asserted, for purposes of this motion, Defendants refer the Court to the facts set forth in paragraphs three through fifteen of the Petition:

> 3. On information and belief, PICKENS is the Chief Executive Officer, President, and primary shareholder of defendant FLOMORE.
>
> 4. In or about October 2013, the Petitioners met representatives of the Defendants at a trade show for oil field supply products. Ultimately, the relationship between Petitioners and Defendants developed to the point that Petitioners introduced

PICKENS to the idea of launching a new product, specifically a solar-powered chemical injection pump to be used in oil-and-gas-production. The Petitioners had been working on a design for a new and improved solar powered pump, the S2000, which was conceived of and designed by Petitioners and had numerous advantages over the pump that PICKENS and FLOMORE were marketing at the time.

5. In April 2014, PICKENS and one other member of the FLOMORE leadership team, Manager of Operations Mitch Carey, flew from Oklahoma to Louisiana in order to observe the Petitioners' prototype of the S2000 in operation. The Petitioners demonstrated the pump to the FLOMORE representatives in Arcadia, Louisiana. PICKENS and Carey were so impressed with the pump that PICKENS immediately agreed that he wanted to go into business with Petitioners to produce and market the pump.

6. During the meeting in Arcadia, Louisiana, PICKENS agreed with Petitioners that if they would develop the S2000 pump into a commercially marketable product, then they would all go into business together selling the pump and split the profits from the venture, with Petitioners receiving 50% and PICKENS/FLOMORE receiving 50% of the net profits from each sale of an S2000 pump. This proposal was attractive to Petitioners because it offered them a chance to market the pump to FLOMORE's broad customer base. PICKENS and FLOMORE would receive the benefit of the Petitioners' new and improved pump design and their efforts to bring it to market. Petitioners and PICKENS affirmatively agreed and shook hands on the deal, thereby forming a valid and enforceable contract.

7. Thereafter, and at the urging of PICKENS and FLOMORE, the Petitioners embarked on an intensive effort to get the S2000 pump ready for sale. Petitioners traveled from Louisiana to Oklahoma numerous times to work on the S2000's design and production. They met and worked with a number of employees of FLOMORE and also with some of FLOMORE's suppliers. Ultimately, because of their extraordinary efforts and immense devotion of time to the project, Petitioners completed development of the S2000 within six months. A project of this scope usually requires two to three years to complete, but Petitioners were able to complete the development within six months because they significantly reduced the amount of time devoted to their other business, causing a substantial reduction in sales, while they developed the S2000 for market.

8. During this development period, Petitioners had another meeting with PICKENS in which they again discussed their agreement to develop and market the pump in exchange for 50% of the net profits from the venture. At this meeting, PICKENS proposed and Petitioners agreed that they would form a new division of FLOMORE in order to market the pump. Petitioners would be 50% owners of this new division and would receive 50% of the net profits from each sale of a pump.

9. Also during this period, petitioner LEO TRIPP met with PICKENS numerous times to discuss the S2000. Petitioner LEO TRIPP requested on a number of occasions that PICKENS have his lawyers reduce their agreement to writing. Although PICKENS told LEO TRIPP that he would do so, he never followed through on his assurances. These promises were part of PICKENS's scheme to induce Petitioners into continuing to develop the S2000 pump for market.

10. As the S2000 approached completion, Petitioners used their own customer base to conduct trials of the pump in action. The pump exceeded expectations during these trials.

11. Additionally, petitioner LEO TRIPP was tasked by PICKENS with developing training seminars, sales brochures, and engineering data to be used in the marketing of the pump. He also coordinated with various manufacturers/suppliers to secure the various components for the pump and otherwise ensure a successful product launch.

12. As a result of Petitioners' monumental efforts, the pump was ready for a product launch in August 2014. Still operating in good faith and expecting Defendants PICKENS and FLOMORE to live up to their agreement, petitioner LEO TRIPP conducted a product launch training seminar for potential customers at Cardon Sales, one of FLOMORE's top distributors, located in Broussard, Louisiana on August 4, 2014. The product launch was a tremendous success and interest in the S2000 pump spiked.

13. Thereafter, FLOMORE and PICKENS began marketing and selling the pump. Knowing that FLOMORE was receiving a profit from each sale of a S2000 pump, Petitioner LEO TRIPP attempted to contact PICKENS to discuss moving forward on the agreement to split the net profits from the pump fifty/fifty with Petitioners. PICKENS, however, refused to discuss the agreement with LEO TRIPP at all, and soon thereafter cut off all communication with Petitioners. LEO TRIPP persisted with his attempts to discuss the situation with PICKENS or someone else at FLOMORE, but eventually he was told that all FLOMORE employees had been instructed to cut communications with Petitioners.

14. Not one of the Petitioners ever received any financial benefit or other consideration from FLOMORE or PICKENS for any work they devoted towards development of the S2000. To date, Petitioners have never received any benefit from the agreement they made with PICKENS/FLOMORE to split the profits from the pump between them fifty/fifty. The Defendants completely shut Petitioners out from any profits from the pump, which Petitioners had developed with PICKENS/FLOMORE only because of the agreement they made with PICKENS to split the profits. Quite simply, the Defendants broke their promise to split the

profits with Petitioners, and they have made substantial sums because of it.

15. On information and belief, the Defendants continue to market and sell the S2000 pump as if it were their own, and it has generated millions of dollars of revenue for defendant FLOMORE. Petitioners have not seen a dime of this money.

[Doc. No. 1-1, ¶¶ 3-15].

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the

Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248).

### B. Claims against Pickens

Defendants contend that, based on the undisputed facts and the allegations contained in Plaintiffs' Petition and in their testimony, Plaintiffs have no cause of action against Pickens individually. Plaintiffs "concede to the dismissal of Pickens as a defendant[.]" [Doc. No. 31, p. 23]. Accordingly, Defendants' Motion for Summary Judgment is GRANTED to this extent, and the claims against Pickens are DISMISSED WITH PREJUDICE.

### C. Breach of Contract

Defendants contend that they are entitled to summary judgment on Plaintiffs' breach of contract claim because Plaintiffs have failed to establish there was a meeting of the minds between the parties. More specifically, Defendants argue that the parties contemplated a written contract, and they were not bound in the absence of the execution of the contract in written form. Plaintiffs contend that if the Court views the evidence in the light most favorable to them, there was a sufficient "meeting of the minds" to form a valid oral contract.

Under Louisiana law, whether a contract exists is a question of fact. *Townsend v. Urie*, 00-0730 (La. App. 1 Cir. 5/11/01); 800 So. 2d 11, 15, writ denied, 01-1678 (La. 9/21/01); 797 So. 2d 674. The formation of a valid and enforceable contract requires capacity, consent, a certain object and a lawful cause. *La Bo J Partnership v. Louisiana Lottery Corp.*, 08-1279 (La.

App. 1 Cir. 1/30/09); 6 So. 3d 191 (citing LA. CIV. CODE ARTS. 1918, 1927, 1966, and 1971).

Consent requires there be a meeting of the minds of the parties through an offer and acceptance. LA. CIV. CODE ART. 1927. Unless the law prescribes a certain formality for the contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. *Lambert v. Don M. Barron Contractor, Inc*., 42,868 (La. App. 2 Cir. 1/9/08), 974 So. 2d 198, 201 (citing LA. CIV. CODE ART. 1927).

When a party contends that he had an oral contract, "[i]f the price or value of [the] oral contract is in excess of $500, the contract must be proved by at least one witness and other corroborating circumstances." *Joyner v. Liprie,* 44-852-CA (La. App. 2 Cir. 1/29/10), 33 So.3d 242, 250 (citing LA. CIV. CODE ART. 1846).1 "To meet the burden of proof of an oral contract by a witness and other corroborating circumstances, a party may serve as his own witness and the 'other corroborating circumstances' may be general and need not prove every detail of the plaintiff's case." *Pennington Constr., Inc. v. R A Eagle Corp.*, 94-CA-0575 (La. App. 1 Cir. 3/3/95), 652 So.2d 637, 639 (citation omitted). "[T]he corroborating circumstances that are required must come from a source other than the plaintiff," but "[w]hether there were corroborating circumstances sufficient to establish an oral contract is a question of fact." *Id.; see also Joyner*, 33 So.3d at 250.

If, on the other hand, "[w]hen in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract

---

[1]"When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence." LA. CIV. CODE ART. 1846. Certainly, the parties in this case anticipated revenues in excess of $500.

6

is executed in that form." LA. CIV. CODE ART. 1947. That presumption may be rebutted by performance. *See Myers v. Burger King Corp.*, 618 So.2d 1123, 1126 (La. App. 4 Cir. 1993); *Sealevel Const., Inc. v. Westcoast Corp.*, Civil Action No. 12-874, 2014 WL 3587264 *7 (E.D. La. July 18, 2014).

Considering this case law together, Defendants must first establish as a matter of law that the parties contemplated that the contract be executed in writing. Then, if Defendants meet this showing, Plaintiffs must have produced sufficient evidence that there is genuine issue of material fact for trial to overcome the presumption that the parties did not intend to be bound until the contract was executed in writing.

Having reviewed Defendants' evidence and that submitted by Plaintiffs, the Court finds there are genuine issues of material fact for trial. Viewing the evidence in the light most favorable to Plaintiffs, the jury could find that at the meeting in Arcadia, Pickens, Leo Tripp, and Steve Stone ("Stone") orally agreed that Plaintiffs would complete development of the pump for Flomore, Flomore would bring the pump to market, and Plaintiffs would collectively receive 50% of the profits while Flomore would receive the other 50%, all of which are sufficient to form an oral contract. At the end of the conversation among the participants, they shook hands and, in Leo Tripp's mind, they "had made the agreement." [Doc. No. 31, Exh. C, Leo Tripp Depo., pp. 122-23]. Stone testified that Pickens inquired whether they wanted him to buy the pump, but then they discussed going into business together with a commitment "[a]bout the 50/50 profit." [Doc. No. 31, Exh. B, Steve Stone Depo., pp. 55-57]. Stone understood that the 50/50 split was in place without the necessity of a written agreement. *Id.* at pp. 59-60.

In addition to Leo Tripp's and Stone's testimony about the Arcadia meeting, the

7

corroborating circumstances support their claims. At Pickens' request or offer, they traveled to Oklahoma City the following week and met again with him about establishing a solar division of the company to sell and market the pump, and they again shook hands on the deal. [Doc. No. 31, Exh. C, Leo Tripp Depo., pp. 143-45; Exh. B, Steve Stone Depo., pp. 75-76; Exh. D, Jimmy Tripp Depo., pp. 46-47]. During the week following the meeting in Oklahoma City, allegedly at Pickens' insistence, Plaintiffs worked in the machine shop used by Flomore on the designs for the pump components. Once they returned to Louisiana, Flomore shipped component parts to them which they used to assemble prototype pumps and to place in the field for testing with Stone's customers. Finally, after additional work, there was an August 14, 2014 product launch in Broussard,[2] Louisiana, which was attended by Plaintiffs and Pickens and Flomore personnel. Plaintiffs contend that Flomore delegated the presentation to them on how to assemble and disassemble the pump. Based on all these alleged facts, Plaintiffs contend that they have established that they had an oral contract, or, alternatively, that any initial contemplation of reducing the contract to writing has been rebutted by the parties' performance.

Defendants have pointed to Plaintiffs' own allegations and testimony that they asked Pickens to have his lawyer draw up a written contract on multiple occasions. Defendants, of course, contend that they did not intend to be bound until a written contract was executed. Further, in their Reply, Defendants point to Stone's June 9, 2015 letter [Doc. 29-7] in which he states:

> Another reason we have not been rushed to send payment is the circumstances concerning the solar pump development. We took you and Mr. Pickens, at your word, regarding some kind of contract for our part of the

---

[2] Plaintiffs refer to the product launch as being in Lafayette, Louisiana, in their memorandum, but earlier stated in their Petition that the product launch was in Broussard.

8

> development of the solar pump.

---

> I am sure that you have heard the saying "Two wrongs do not make a right."
> Inquire of Mr. Pickens if he would consider a meeting with me so we might be
> able to come to a written, acceptable agreement for both parties. . . .

Defendants argue that this, along with the other evidence, shows conclusively that the parties had not entered into an oral contract and that they contemplated a written contract within the provisions of Article 1947, precluding a breach of contract claim. Finally, they argue that this presumption has not been rebutted by performance because such performance must be undertaken by both parties to the contract, not just one.

The Court disagrees. Defendants have certainly produced evidence, which if believed and if construed in the manner that they contemplate, would support the finding that there was no contract. However, the jury, in weighing credibility and assessing evidence, may not view all the evidence in the manner Defendants contemplate. For example, the Stone letter could well be interpreted to mean that Plaintiffs took Pickens at his word that they had **entered** some type of oral contract for the development of the solar pump and that once Pickens questioned that alleged oral contract, Stone sought assurances through the entry of a written contract. Given Plaintiffs' testimony and Pickens' alleged active encouragement for them to proceed without a written contract, Defendants' provisions of facilities to work on the pump, and the participation or at least attendance of both parties at the product launch (which could certainly be viewed as the marketing of the product), the Court cannot say as a matter of law that no contract existed. Even if the parties only contemplated being bound once a written contract was entered at the initiation of the relationship, Plaintiffs have raised genuine issues of material fact for trial whether there was sufficient performance by both parties to rebut this presumption. Under these

circumstances, there are genuine issues of material fact for trial, and Defendants' Motion for Summary Judgment on Plaintiffs' breach of contract claim is DENIED.

### D. Detrimental Reliance

Defendants next contend that they are entitled to summary judgment on Plaintiffs' detrimental reliance claim. They argue that if Plaintiffs' breach of contract claim is barred under article 1947, their detrimental reliance claim is also barred.

> Detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence.... This is because detrimental reliance is not based upon the intent to be bound. Rather, the basis of detrimental reliance is the idea that a person should not harm another person by making promises that he will not keep. Thus, the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment.

*Benton v. Clay*, 48,245 (La. App. 2 Cir. 8/7/13), 123 So.3d 212, 222–23 (citations omitted). "To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Suire v. Lafayette City–Parish Consol. Gov't*, 2004–1459 (La.4/12/05), 907 So.2d 37, 59; *see also Luther v. IOM Co. LLC*, 13-0353 (La. 10/15/13), 1310 So.3d 817, 825. "Significantly, to prevail on a detrimental reliance claim, Louisiana Law does not require proof of a formal, valid, and enforceable contract." *Suire*, 907 So.2d at 59. Detrimental reliance "usually functions when no written contract or an unenforceable contract exists between the parties." *Drs. Bethea, Moustoukas and Weaver LLC*, 376 F.3d at 403 (5th Cir. 2004).

With regard to the second element, justifiable reliance, Defendants cite the Court to *JCD*

*Marketing Co. v. Bass Hotels and Resorts, Inc.,* 2001-1096 (La. App. 4 Cir. 3/6/02), 812 So.2d 834, 840, for the proposition that reliance on "a promise not in the form contemplated by the parties is presumptively unreasonable." First, however, the Court has concluded that there are genuine issues of material fact for trial as to whether Plaintiffs intended to be bound prior to executing a written contract. Second, as the Federal District Court for the Eastern District of Louisiana noted in discussing *JCD Marketing*, whether a party's "reliance was unreasonable" is a "fact-laden determination that should normally be left to the factfinder." *Voelkel McWilliams Const., LLC v. 84 Lumber Co.*, Civil Action No. 13-6789, 2015 WL 4392899 at *4 (E.D. La. July 17, 2015).

Given the conflicting evidence in this matter, the Court finds that there are genuine issues of material fact for trial whether Plaintiffs can establish an alternative cause of action for detrimental reliance. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' detrimental reliance claim is DENIED.

### E. Unjust Enrichment

Defendants also contend that they are entitled to summary judgment on Plaintiffs' unjust enrichment claim because Plaintiffs had another cause of action for breach of contract. Defendants argue that the existence of this other cause of action, even if not successful, precludes Plaintiffs from bringing a cause of action of unjust enrichment. Plaintiffs concede that Defendants are entitled to summary judgment on this claim. [Doc. No. 31, p. 23]. Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' unjust enrichment claim, and that claim is DISMISSED WITH PREJUDICE.

### F. Punitive Damages

Finally, Defendants contend that they are entitled to summary judgment on Plaintiffs' claim for punitive damages because they have no statutory right to recovery of these damages. Plaintiffs concede to dismissal of this claim as well. [Doc. No. 31, p. 23]. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' punitive damages claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 29] is GRANTED IN PART and DENIED IN PART. To the extent that Plaintiffs asserted any claims against Defendant Richard Pickens and against all Defendants for unjust enrichment and punitive damages, the motion is GRANTED, and these claims are DISMISSED WITH PREJUDICE. The motion is otherwise DENIED with regard to Plaintiffs' breach of contract and detrimental reliance claims.

**MONROE, LOUISIANA, this 18th day of April, 2018.**

**TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE**